1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH A. HASKELL and
REGINALD ENTO,

              Plaintiffs,

  v.

EDMUND G. BROWN JR., et al.,

              Defendants.

_____/

No. C 09-04779 CRB

**ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION**

      Plaintiffs seek to enjoin the enforcement of California Penal Code § 296(a)(2)(C), which provides for the mandatory DNA sampling of felony arrestees in the State of California. Plaintiffs allege that this section violates both the Fourth and Fourteenth Amendments. Although Plaintiffs argue convincingly that arrestees have greater privacy interests than convicted felons, from whom the Ninth Circuit has already condoned the taking of DNA samples, Plaintiffs have not established that they are likely to succeed, or that the balance of the equities tips in their favor. Accordingly, the Court DENIES the motion.

**I. BACKGROUND**

      1.    <u>DNA Seizure, Analysis and Expungement in California</u>

      California has collected biological samples for its law enforcement database since 1984. Opp. at 2 (citing 1983 Cal. Stat. Ch. 700, § 1 (repealed 1998). In 1998, California's Legislature enacted the DNA Act, which authorized the seizure of DNA from individuals convicted of certain serious and violent crimes. Opp. at 2 (citing 1998 Cal. Stat. Ch. 696, §

United States District Court
For the Northern District of California

2).  Then, in November 2004, California voters passed Proposition 69, which enacted Penal Code section 296(a)(2)(C).  MPI at 2.  That new section greatly expanded the scope of individuals in California who are subject to warrantless DNA seizures by law enforcement. Id.  Proposition 69 required warrantless seizure of DNA from all individuals convicted of any felony.  Id.  (citing § 296(a)(1)).  It also provided that, beginning January 1, 2009, warrantless seizure of DNA would be required of any adult arrested for any felony.  MPI at 2 (citing § 296(a)(2)(C)).

By law, collection of DNA takes place "immediately following arrest, or during the booking . . . process or as soon as administratively practicable after arrest, but, in any case, prior to release on bail or pending trial or any physical release from confinement or custody." MPI at 2 (citing § 296.1(a)(1)(A); Meier Decl. Ex A at 2 (Cal DOJ DNA Information Bulletin 08-BFS-02)).  DNA samples are taken using a buccal swab, which consists of gently scraping the inner cheek repeatedly with a small stick.  Opp. at 3 (citing §§ 296; 296.1). DNA samples are not taken from individuals who have already had their DNA samples taken.  See Konzak Decl. at ¶ 28; Meier Decl. Ex. A at 3 (noting that agents are to determine if an individual's DNA sample has already been taken, to avoid "duplicate collections"). Law enforcement has no discretion in collecting these samples.  Opp. at 3 (citing People v. King, 82 Cal. App. 4th 1363, 1373 (2000)).

After the DNA sample is taken, it is sent to the Department of Justice's lab for analysis.  MPI at 3.  The sample may only be tested to reveal an individual's identity.  Opp. at 3 (citing § 295.1 ("The Department of Justice shall perform DNA analysis . . . pursuant to this chapter only for identification purposes").  From the sample, a genetic profile is created

based on thirteen (13) "junk" genetic markers ("loci") on the DNA, so titled because they are thought not to reveal anything about trait coding.  Opp. at 3; Konzak Decl.[1]

The profile is then uploaded into California's DNA data bank, which is part of the nationwide Combined DNA Index System ("CODIS"), accessible to local, state and federal law enforcement.  MPI at 3.  "Beyond the STR-generated DNA profile, CODIS records contain only an identifier for the agency that provided the DNA sample, a specimen identification number, and the name of the personnel associated with the analysis."  See United States v. Kincade, 379 F.3d 813, 819 n. 8 (9th Cir. 2004) (en banc) (plurality); see also 61 Fed. Reg. 37496 (July 18, 1996) (federal DNA database contains DNA profiles, defined as "a set of DNA identification characteristics" – database not to "contain case-related or other personally identifying information about the person from whom the DNA sample was collected").  Arrestee DNA profiles are entered into a special Arrestee Index.  Konzak Decl. at ¶ 34.  The DNA samples themselves are retained at the lab.  MPI at 1.

The DNA Act limits disclosure of samples and results of testing to law enforcement personnel.  Opp. at 3 (citing § 299.5(f)).  Any individual who uses a sample or DNA profile for any purpose other than identification, or who discloses the sample or DNA profile, faces up to a year in prison.  Opp. at 3 (citing § 299.5(i)(1)(A).[2]  Any DOJ employee who misuses or improperly discloses a sample or DNA profile is also subject to a fine of up to $50,000.  Opp. at 3 (citing § 299.5(i)(2)(A).  To date, there has not been one instance in which charges were brought against an employee of the DOJ for violating the DNA Act.  Opp. at 4 (citing

---

[1]The Court is aware that so-called "junk" DNA might someday be found to contain genetic programming material.  See United States v. Kincade, 379 F.3d 813, 818 n.6 (9th Cir. 2004) (en banc) (plurality); but see D.H. Kaye, "Please, Let's Bury the Junk: The Codis Loci and the Revelation of Private Information," 102 Nw. U. L. Rev. Colloquy 70 , 71 (2007) ("No one can say for certain what the future of genetics holds, but based on current knowledge and practice, the information coded in the databases is and will remain, with . . . limited exceptions . . . useful only for identification").  Nonetheless, the Court must address the facts as they are – and as they are understood– today.

[2]  However, Plaintiffs assert that "[a]lthough both federal and California law only allow disclosure for 'law enforcement identification purposes,' nothing about 'identification purposes' limits on its face to information regarding non-coding regions of the genome."  Murphy Decl. at ¶ 41.  If the government were to begin analyzing the coding regions of individuals' DNA, that would be a different case; those facts are not currently before the Court.

**United States District Court**
For the Northern District of California

1    Hares Decl. ¶¶ 14, 16-18).  In addition, no audit has ever cited a California CODIS lab for

2    any violation of confidentiality or use restrictions.  See Konzak Decl. at ¶ 7.

3        Searching of the CODIS database takes place frequently.  As soon as a profile is

4    uploaded, it is immediately compared to the crime-scene samples already in that CODIS

5    index.  MPI at 3.  Any new crime-scene samples are searched against it.  Id.  In addition, a

6    search of the entire system is performed once a week.  Id. (citing Birotte v. Superior Court,

7    177 Cal. App. 4th 559, 565 (2009)).  When a "hit" is made– a match between the offender

8    (convicted offender or arrestee) profile and a crime-scene profile– a confirmation process

9    takes place, which includes a de novo analysis of the offender DNA sample.  Von

10   Beroldingen Decl. at ¶¶ 15-17.  Once the hit has been confirmed, the CODIS unit sends a

11   written notification of the offender's identity to the submitting laboratory, which then may

12   forward the notification on to the client law enforcement agency.  Id. at ¶ 18.  California also

13   conducts "familial searching," in which law enforcement uses the DNA database to identify a

14   person whose DNA does not match the crime-scene evidence but is similar enough that the

15   person might be related to the criminal.  MPI at 3-4. However, the government maintains that

16   it does not conduct familial searching of the Arrestee Index.  Von Beroldingen Decl. at ¶ 13.

17       Under the statute, the process for expunging an individual's sample and profile is

18   rather lengthy.  Where no charges are filed, the case is dismissed, or the arrestee is found not

19   guilty or factually innocent, the arrestee must still wait until the statute of limitations has run

20   before applying for expungement.  MPI at 4 (citing § 299(b)).  Depending on the felony for

21   which he or she was arrested, this is a minimum of three years.  Id.  After requesting relief

22   and notifying the DOJ, former arrestees must then wait an additional 180 days before a court

23   can authorize expungement.  Id. (citing § 299 (c)(2)(D)).  Then, the court's order, either

24   granting or denying expungement, is nonappealable.  Id. (citing § 299(c)(1)).  Moreover,

25   expungement can be prevented if there is "an objection by the Department of Justice or the

26   prosecuting attorney."  Id. (citing § 299(c)(2)(D)).  According to the government, "[a]lthough

27   the law allows prosecutors to wait the entire period of the statute of limitations to file

28   charges," California District Attorneys do not wait for the statutory period to run in order to

4

certify a dismissal for a defendant who wants his or her record expunged.  Von Beroldingen Decl. at ¶ 6.  Further, Defendants have offered to expunge the named Plaintiffs' samples on an expedited basis.  Id. at ¶ 8.  The government reports that it has expunged 904 convicted felon samples, and denied 8 requests for expungement.  Id. at ¶ 7.  It has apparently not expunged any arrestee samples.

        2.    <u>Plaintiffs in this Case</u>

Plaintiff Lily Haskell was arrested in March 2009 for allegedly trying to free another prisoner at a peace rally.  MPI at 5.  At jail, she was ordered to provide a DNA sample and was told that if she refused to comply immediately or if she waited for a lawyer, she would be charged with a misdemeanor.  Id.  She gave a sample, and was never charged with any crime.  Id.

Plaintiff Reginald Ento was arrested in early 2009 for possession of stolen property.  MPI at 5.  The sheriff's deputy collected a DNA sample from him using a buccal swab.  Id.  Plaintiff Ento was released, and the allegations against him were dropped.  Id.

The ACLU, counsel for Plaintiffs, first filed suit when Proposition 69 passed; however, that case was dismissed as unripe.  <u>See</u> <u>Weber v. Lockyer</u>, 365 F.Supp. 2d 1119, 1126 (N.D. Cal. 2005).  Plaintiffs then filed this class action suit in October 2009 against Edmund G. Brown, Jr., Attorney General; Eva Steinberger, Assistant Bureau Chief for DNA Programs, California Department of Justice; and Michael Hennessey, Sheriff of San Francisco County.  They have now moved for a preliminary injunction, asking the Court to enjoin Defendants from seizing, searching, analyzing, or making any use of DNA samples or analysis of DNA samples from persons arrested for, but not convicted of, a crime.  MPI at 1.

**II. DISCUSSION**

To prevail on a motion for preliminary injunction, Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they face irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  <u>See</u> <u>Winter v. N.R.D.C.</u>, 129 S. Ct. 365, 374 (2008).

        1.    <u>Likelihood of Success</u>

**United States District Court**
For the Northern District of California

As a preliminary matter, Plaintiffs assert that § 296(a)(2)(C) violates both the Fourth and Fourteenth Amendments.  They argue that under the Fourteenth Amendment, the DNA sampling violates arrestees' right to informational privacy.  MPI at 2-3.  They further argue that the government has shown neither a legitimate interest in those individuals' DNA, nor that its actions are narrowly tailored to meet that interest.  Id. at 9.  But Plaintiffs merge their Fourteenth Amendment and Fourth Amendment arguments in their papers; and indeed, courts generally treat this issue as a Fourth Amendment issue.  See Norman-Bloodsaw v. Lawrence Berkeley Laboratory, 135 F.3d 1260, 1269 (9th Cir. 1998) ("Because it would not make sense to examine the collection of medical information under two different approaches, we generally analyze medical tests and examinations under the rubric of the Fourth Amendment") (internal quotations omitted).  Accordingly the Court's focus, like the parties', is on the Fourth Amendment.

Plaintiffs argue that the taking of arrestees' DNA samples constitutes an unreasonable search under the Fourth Amendment.  MPI at 6.  Invasions of the body are searches, and are entitled to Fourth Amendment protection.  See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616 (1989); Schmerber v. California, 384 U.S. 757, 767 (1966).  Just like compulsory extraction of blood for DNA testing, buccal swab sampling constitutes a search under the Fourth Amendment.  See Friedman v. Boucher, 580 F.3d 847, 852 (9th Cir. 2009).

Section 296(a)(2)(C) does not require a warrant for buccal swab testing.  A search's reasonableness usually depends on whether it was made pursuant to a warrant issued under probable cause.  See Rise v. Oregon, 59 F.3d 1556, 1559 (9th Cir. 1995), overruled on other grounds by Ferguson v. City of Charleston, 532 U.S. 67 (2001).  However, there are "certain established and well-defined exceptions to the warrant clause."  United States v. Brown, 563 F.3d 410, 414-15 (9th Cir. 2009).  Here, the government does not argue that a specific exception applies– and for good reason.  The Ninth Circuit has rejected the application of the "special needs" exception to other DNA cases, because that exception pertains only to searches for "non-law enforcement purposes," and one of the purposes of DNA searches is

**United States District Court**
For the Northern District of California

1   the solving of "cold cases," a quintessential law enforcement purpose.  See Friedman, 580

2   F.3d at 853.

3       Instead, the Ninth Circuit analyzes cases such as this by assessing whether the search

4   is reasonable, "gauged by the totality of the circumstances."  See Kincade, 379 F.3d at 831-

5   32; see also Rise, 59 F.3d at 1559.[3]  Most other circuits apply this same test.  See Banks v.

6   United States, 490 F.3d 1178, 1183 (10th Cir. 2007) (adopting totality of circumstances test

7   and noting that "the Third, Fourth, Fifth, Eighth, Ninth, Eleventh, and District of Columbia

8   Circuits apply a reasonableness test informed by the totality of the circumstances").  Courts

9   are to "balance the degree to which DNA profiling interferes with the privacy interests of the

10  [individual] against the significance of the public interests served by such profiling."

11  Kincade, 379 F.3d at 836.  See also United States v. Kriesel, 508 F.3d 941, 947 (9th Cir.

12  2007) (following Samson v. California, 547 U.S. 843, 848 (2006)).

13          A.      Landmark Cases in the Ninth Circuit

14      Three recent cases illustrate how the Ninth Circuit has weighed the individual's

15  interest against the government's interest in the context of DNA sampling.

16      In Kincade, decided in 2004, the Ninth Circuit found that the balance tipped in favor

17  of the government.  That case involved the compulsory DNA profiling of certain convicted

18  but conditionally released federal offenders pursuant to the federal DNA Act.  379 F.3d at

19  816.  Kincade, who had committed a qualifying offense, was asked to submit a blood sample

20

21

22

23  ──────────────────

24      [3] Plaintiffs point to Friedman and argue that the Ninth Circuit does not apply the totality of the circumstances test, instead following Schmerber's requirement of either a warrant or both probable cause and exigent circumstances.  MPI at 7.  Although Friedman arguably did not apply the totality of

25  the circumstances test, it did not reject that test, either– it simply found that the search at issue was unjustified under either the "special needs" exception, the state's reliance on a statute, or "on general

26  Fourth Amendment principles."  See 580 F.3d at 858.  To the extent that some test other than the totality of the circumstances test is appropriate in the case of arrestees' DNA, the Ninth Circuit has not yet so

27  held.  Moreover, Kincade characterized other circuits' use of the totality of the circumstances test as applying to "compulsory DNA profiling," without reference to the population being tested.  See 379

28  F.3d at 831.  While Plaintiffs maintained, at the motion hearing, that the totality of the circumstances test was improper, they argued that they should nonetheless win under that test.

to his probation officer pursuant to the Act, and he refused. Id. at 820. The court, sitting en banc, applied the totality of the circumstances test.[4]

The court first took stock of Kincade's expectation of privacy, and found that "parolees and other conditional releasees are not entitled to the full panoply of rights and protections possessed by the general public," but that "those who have suffered a lawful conviction are properly subject to a broad range of [restrictions] that might infringe constitutional rights in free society." Id. at 833 (internal quotations omitted). It added that conditional releasees are "clearly informed of the condition requiring them to submit to compulsory DNA profiling, thus further reducing any expectation of privacy they otherwise may enjoy." Id. at 838 n. 36. The court concluded that this population had a "substantially diminished expectation[] of privacy." Id. at 839.

The court then assessed the invasiveness of the search. While the court recognized that "compulsory blood tests implicate the individual's interest in bodily integrity– a 'cherished value of our society,'" it added that "the intrusion occasioned by a blood test is not significant" because such tests are commonplace, the quantity of blood extracted is minimal, and the procedure usually involves no risk, trauma or pain. Id. at 836 (citing Schmerber, 384 U.S. at 771-72 and Skinner, 489 U.S. at 625). The court went on to find that, beyond the extraction of blood, "the DNA profile derived from [it] establishes only a record of the defendant's identity– otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody)." Id. at 837. Though Kincade and amici argued that the DNA samples "could be mined for more private information or otherwise misused in the future," the court took comfort in the protections against misuse built into the Act, and noted that "our job is limited to resolving the constitutionality of the program before us, as it is designed and as it has been implemented." Id. at 837-38.

---

[4] Judge O'Scannlain's opinion (joined by four other judges) applied the totality of the circumstances test, but Judge Gould, concurring, advocated applying the special needs exception. See id. at 840 (Gould, J., concurring). Five judges dissented. See id. at 842, 871, 875.

1      Finally, the court evaluated the government's interests in Kincade's DNA.  The court

2    echoed the holding in <u>Rise</u> that "[o]nce a person is convicted . . . his identity has become a

3    matter of state interest."  <u>Id.</u> at 837 (citing <u>Rise</u>, 59 F.3d at 1560).  It went on to list three

4    "undeniably compelling" interests served by the DNA Act.  <u>Id.</u> at 838.  First, it noted that

5    society had an "overwhelming interest" in supervising parolees and making certain that they

6    complied with the requirements of their release.  <u>Id.</u>  Second, it asserted that such profiling

7    has a deterrent effect, and that the rates of re-arrest among parolees is quite high.  <u>Id.</u> at 838-

8    39.  Third, it held that "by contributing to the solution of past crimes, DNA profiling of

9    qualified federal offenders helps bring closure to countless victims of crime."  <u>Id.</u> at 839.

10   Together, the court found the weight of these government interests to be "monumental."  <u>Id.</u>

11     The court then concluded that in light of the individual's minimal interest, the minimal

12   intrusion, and the "overwhelming societal interests" served, the taking of Kincade's DNA

13   was reasonable under the totality of the circumstances.  <u>Id.</u>  The court emphasized "the

14   limited nature of [its] holding," explaining that it pertained to "lawfully adjudicated criminals

15   whose proven conduct substantially heightens the government's interest in monitoring them

16   and quite properly carries lasting consequences."  <u>Id.</u> at 835-36.  However, Judge Reinhardt

17   cautioned in a powerful dissent that "countless groups of individuals . . . have reduced

18   expectations of privacy" – including arrestees – and that "in the face of 'monumental

19   government law enforcement interests, I find it difficult to understand when suspicionless

20   searches would be found to violate the Fourth Amendment."  <u>Id.</u> at 864-65 (Reinhardt, J.,

21   dissenting).  He warned that "[t]he 'balancing of interests' does not provide much of a

22   balance– to the contrary, any reasonable reading of the plurality's decision reveals that the

23   'balance' will always tilt in favor of the government."  <u>Id.</u> at 866.[5]

24     In <u>Kriesel</u>, a 2007 case, the Ninth Circuit again found that the balance tipped in favor

25   of the government, this time as to the expansion of the federal DNA Act to include all

26   felonies.  <u>See</u> 508 F.3d at 942.  Kriesel was a convicted felon whose terms of supervised

27

28          [5] In a separate dissent, Judge Kozinski also noted that "[a]pplying the plurality's balancing
     analysis, I'm hard pressed to see how this would violate anyone's Fourth Amendment rights."  <u>Id.</u> at 872
     (Kozinski, J., dissenting).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   release included a condition that he submit his person to search.  <u>Id.</u> at 944.  He objected to

2   the taking of his DNA.  <u>Id.</u>  Noting that "the majority of circuits adopt a 'totality of the

3   circumstances' framework," the court applied the test as follows.  <u>Id.</u> at 946.

4         First, the court held that parolees have severely diminished expectations of privacy.

5   <u>Id.</u> at 947 (citing <u>Samson</u>, 126 S. Ct. at 2199 and <u>Kincade</u>, 379 F.3d at 834).  Specifically the

6   court found that due to Kriesel's "status as a supervised releasee, he has a diminished

7   expectation of privacy in his own identity." 508 F.3d at 947.

8         Next, the court looked at the invasiveness of the search, and found that "tracking . . .

9   identity is the primary consequence of DNA collection."  <u>Id.</u>  While the court stated that it

10   was "mindful of the caution that DNA often reveals more than identity, and that with

11   advances in technology, junk DNA may reveal far more extensive genetic information," it

12   noted that the Act contained privacy protections that created criminal penalties for

13   unauthorized use of the DNA.  <u>Id.</u> at 847-48.  In addition, the court held again that the

14   intrusion caused by a blood test is "not significant."  <u>Id.</u> at 948.

15         Finally, the court held that the government's interests as articulated in <u>Kincade</u>

16   "applie[d] with equal force."  <u>Id.</u> at 949.  It found that the government has an interest in

17   identification, and that "[a]lthough fingerprint evidence might often be sufficient to identify a

18   past offender, DNA collection provides another means" to meet this "significant need."  <u>Id.</u>

19   It found that "the deterrent effect of such profiling fosters society's interest in reducing

20   recidivism," and that non-violent offenders' recidivism rates, though not as high as violent

21   offenders', are "significant."  <u>Id.</u> at 949-50, n.11.  And it found that the government has an

22   interest in solving past crimes, even nonviolent crimes.  <u>Id.</u>

23         In light of this balancing test, the court found the taking of Kriesel's DNA to be

24   reasonable.  <u>Id.</u> at 950.

25         In <u>Friedman</u>, decided in September 2009, the Ninth Circuit found that the balance

26   tipped in favor of the individual.  In that case, Friedman had committed a crime in Montana,

27   completed his sentence, and upon his release was neither a parolee or a probationer.  580

28   F.3d at 851.  He then moved to Nevada, and, while a pre-trial detainee awaiting prosecution

**United States District Court**
For the Northern District of California

1  on unrelated charges, was asked to provide a DNA sample. Id. The sample was not required

2  by any Nevada law; the detective simply wanted it to try to solve cold cases. Id. When

3  Friedman refused, the detective forced Friedman's mouth open and forcefully took a buccal

4  swab. Id.

5      Rather than apply a full totality of the circumstances test, the court addressed each of

6  the three justifications the government offered for why the search was constitutional. Id. at

7  853. It rejected the first two, finding that the special needs exception did not apply, and that

8  "adherence to a state statute does not guarantee compliance with the Fourth Amendment" –

9  even if the Minnesota law the government pointed to had applied. Id. at 853-54.

10     Then the court addressed the government's final argument– that the search was

11  "reasonable." Id. at 856. It held that "[n]either the Supreme Court nor our court has

12  permitted general suspicionless, warrantless searches of pre-trial detainees for grounds other

13  than institutional security or other legitimate penological interests." Id. at 857. While it

14  acknowledged various appellate cases upholding state DNA laws, it held that none involved

15  a pretrial detainee "or a state law that mandated searches of pretrial detainees." Id. at 857.[6]

16  The court then distinguished Kincade and Kriesel, noting that "both of those cases concerned

17  extracting DNA from convicted felons still under state supervision." Id. The court held that

18  the bases for those cases did not apply, because Friedman was no longer being supervised by

19  any authority; the Nevada authorities' "purpose was simply to gather human tissue for a law

20  enforcement databank, an objective that does not cleanse an otherwise unconstitutional

21  search." Id. at 858. The court did not address the other government interests identified in

22  Kincade and Kriesel.

23     In light of this analysis, the court in Friedman held that the taking of Friedman's DNA

24  was not reasonable and violated the Fourth Amendment. Id.

25     Given the foregoing background, this Order will now address and weigh the

26  individual's interest and the government's interest in the present case.

27  ─────────────────

28      [6] It is unclear what weight the court would have given to these cases if any had involved a state law mandating searches of pretrial detainees, particularly in light of the court's holding that adherence to a state law does not guarantee compliance with the Fourth Amendment.

**United States District Court**
For the Northern District of California

B.    The Individual's Interest in this Case

Plaintiffs argue that "individuals who have merely been arrested or charged with a crime enjoy a much higher expectation of privacy" than convicted felons, who have a "severely diminished expectation[] of privacy." MPI at 10 (internal citation omitted). Undoubtedly this is true. Convicted felons "have suffered a lawful conviction [and so] are properly subject to a broad range of [restrictions]" to which free people are not. See Kincade, 379 F.3d at 833 (internal citations omitted). The Ninth Circuit in United States v. Scott, 450 F.3d 863, 873 (9th Cir. 2006), held that a defendant "out on his own recognizance before trial" had privacy interests "far greater than a probationer's." Similarly, Judge Easterbrook has described a privacy continuum for offenders in the criminal justice system: at one end are prisoners, whose privacy interests are "extinguished by the judgments placing them in custody," while at the other end are those who have never been convicted. Green v. Berge, 354 F.3d 675, 679-80 (7th Cir. 2004) (Easterbrook, J., concurring). He commented that "what is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population." Id. at 680.

While arrestees certainly have a greater privacy interest than prisoners, it is this Court's view that they also have a lesser privacy interest than the general population. See, e.g., Robert Berlet, "A Step Too Far: Due Process and DNA Collection in California After Proposition 69," 40 U.C. Davis L. Rev. 1481, 1503 (2007) ("Arrestees have a greater expectation of privacy than convicts, but less than free people").[7] Though Kincade and Kriesel both limited their holdings to convicted felons, see Kincade, 379 F.3d at 836, Kriesel, 508 F.3d at 950, even Judge Reinhardt's dissent in Kincade noted that "[a]rrestees' privacy interests, too, appear to be significantly reduced." 379 F.3d at 864 (Reinhardt, J., dissenting) (citing Chimel v. California, 395 U.S. 752, 762-63 (1969)). Indeed, the Ninth Circuit has held that while fingerprinting of "free persons" is a "sufficiently significant interference with individual expectations of privacy" to require probable cause or articulable suspicion,

---

[7] Plaintiffs essentially acknowledged this point at the motion hearing, by answering the Court's question of whether it had the right to object to the taking of its DNA for identification purposes with "You and I do. We haven't been arrested."

United States District Court
For the Northern District of California

"everyday 'booking' procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether investigation of the crime involves fingerprint evidence." Rise, 59 F.3d at 1559-60.

Plaintiffs have not argued that arrestees' privacy interest is such that they cannot reasonably be forced to identify themselves upon arrest through photographs or fingerprints. Kincade stated, in dicta, that once an individual is "lawfully arrested and booked into state custody," he can claim no right of privacy in his identity. 379 F.3d at 837. Magistrate Judge Hollows endorsed this position in United States v. Pool, No. CR S-09-0015, 2009 U.S. Dist. WL 2152081, at *7 (E.D. Cal. May 27, 2009),[8] writing that "[a]n arrestee has a diminished expectation of privacy in his own identity," and that "[p]robable cause has long been the standard which allowed an arrestee to be photographed, fingerprinted and otherwise be compelled to give information which can later be used for identification purposes."[9]

Plaintiffs have not articulated how DNA differs in a legally significant way from other means of identification. They are in good company: the Ninth Circuit has held that the "information derived from the blood sample is substantially the same as that derived from fingerprinting." See Rise, 59 F.3d at 1559; see also Pool, 2009 U.S. Dist. WL 2152081, at *8 ("The court agrees that DNA sampling is analogous to taking fingerprints as part of the routine booking process upon arrest"); United States v. Amerson, 483 F.3d 73, 87 (2d Cir. 2007) (citing Jones v. Murray, 962 F.2d 302, 307 (4th Cir. 1992)) ("[t]he government justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods"). Plaintiffs' arguments at the motion hearing that DNA is different because it is "something of

---

[8] This opinion was adopted by District Judge Garcia, see United States v. Pool, No. CR S-09-0015, 2009 U.S. Dist. WL 215029 (E.D. Cal. July 15, 2009), and is currently on appeal to the Ninth Circuit.

[9] But see United States v. Purdy, No. 8:05CR204, 2005 WL 3465721 at *7 (D. Neb. Dec. 19, 2005) (holding that DNA sampling of arrestees is unconstitutional, in part because "[t]he probable cause that supports an arrest is not necessarily probable cause for a DNA search.").

**United States District Court**
For the Northern District of California

1    mine which is very personal," "the building blocks of our existence," and implicates "our

2    personhood," are emotionally stirring, but not legally compelling.

3        Understandably, much of what drives Plaintiffs' focus on DNA and its ability to

4    "reveal a host of private information about a person" is the "potential for misuse" – a threat

5    that does not apply to fingerprints. <u>See</u> MPI at 9.  Thus, what is unsettling about the analogy

6    Plaintiffs raised at the motion hearing– that the government taking someone's DNA is like

7    taking from him a letter he has written to his partner, even if it assures him it will not read the

8    letter– is the fear that the government may one day betray that promise, and peek.  Or worse,

9    that it will use the contents of that letter in a harmful way.  However, as the court held in

10   <u>Kincade</u>, "beyond the fact that the [statute] itself provides protections against such misuse,

11   our job is limited to resolving the constitutionality of the program before us."  379 F.3d at

12   837-38.  California's law provides for protections against misuse, <u>see</u> Opp. at 3, and there is

13   no evidence of misuse before the Court.

14       Though arrestees' privacy interest is certainly greater than that of convicted felons,

15   Plaintiffs have not shown that arrestees cannot reasonably be forced to identify themselves

16   upon arrest through DNA evidence.  Moreover, the Ninth Circuit has held that the intrusion

17   caused by a blood test is "not significant"– certainly a buccal swab is even less so.  <u>See</u>

18   <u>Kriesel</u>, 508 F.3d at 948.  Accordingly, arrestees' privacy interest, while greater than that in

19   <u>Kincade</u> and <u>Kriesel</u>, is not weighty.

20                    C.    The Government's Interest in this Case

21       However, the government's interests in this case are also not as great as those

22   identified in <u>Kincade</u> and <u>Kriesel.</u>  In <u>Kincade</u>, the court characterized as "a state interest" the

23   confirmation of a defendant's identity.  379 F.3d at 837 (citing <u>Rise</u>, 59 F.3d at 1560).  The

24   <u>Kincade</u> court also discussed government interests in supervising parolees, deterring

25   recidivism, and contributing to the solution of past crimes.  <u>Id.</u> at 838-39.

26       Two of those interests are essentially absent here.  As the court reasoned in <u>Friedman</u>,

27   580 F.3d at 858, arrestees are not under the supervision of any authority.  <u>See also</u> <u>Scott</u>, 450

28   F.3d at 874 ("[t]he government's interests in surveillance and control as to a pretrial releasee

14

**United States District Court**
For the Northern District of California

1    are . . . considerably less than in the case of a probationer").  Moreover, no evidence has been

2    presented in this case that arrestees are more likely to commit future crimes than members of

3    the general population.  See also id. ("the assumption that [a pretrial releasee] was more

4    likely to commit crimes than other members of the public, without an individualized

5    determination to that effect, is contradicted by the presumption of innocence").

6                            i.       Identification

7           On the other hand, the government's interest in accurately identifying the individuals

8    from whom it is taking the DNA, discussed in Kincade, is present here.  The government has

9    a strong interest in identifying arrestees.  See Pool,  2009 U.S. Dist. WL 2152081, at *7 ("An

10    arrestee's identity obviously becomes a matter of legitimate state interest"); Jones, 962 F.2d

11    at 306 ("when a suspect is arrested upon probable cause, his identification becomes a matter

12    of legitimate state interest"); Banks, 490 F.3d at 1190 (recognizing the "Government's

13    interest in accurately identifying suspects who might try to conceal their identities in a

14    variety of ways").  Plaintiffs even acknowledged as much at the motion hearing.

15           Plaintiffs urge, however, that what the government is doing "is not identification; it is

16    investigation for the purposes of inculpation."  Reply at 4.  Similarly, the district court in

17    United States v. Mitchell, No. 2:09cr105, 2009 U.S. Dist. LEXIS 103575 at *28 (W.D. Penn.

18    Nov. 6, 2009) held that although the defendant in that case, a pretrial detainee, had "a

19    diminished expectation of privacy in his identity," "to compare the fingerprinting process and

20    the resulting identification information obtained therefrom with DNA profiling is pure folly"

21    and "oversimplification."  Plaintiffs further assert that the government's practice of verifying

22    a subject's identity with fingerprints before taking his DNA (in order to avoid taking

23    duplicate DNA samples) is proof that fingerprints are used for identification, while DNA is

24    used for something else.  See Pltfs' Post-Argument Citations.

25           While this argument has some initial logical appeal, the Ninth Circuit has

26    unequivocally held that what DNA evidence does is identify.  See Rise, 59 F.3d at 1559 ("the

27    information derived from the blood sample is . . . an identifying marker unique to the

28    individual from whom the information is derived"); Kincade, 379 F.3d at 837 ("the DNA

United States District Court
For the Northern District of California

1  profile derived from the defendant's blood sample establishes only a record of the

2  defendant's identity"); Kriesel, 508 F.3d at 947 ("tracking . . . identity is the primary

3  consequence of DNA collection").  See also § 295.1(a) ("The Department of Justice shall

4  perform DNA analysis . . . pursuant to this chapter only for identification purposes").  This

5  court has no illusions – nor does it believe that the Ninth Circuit in Rise, Kincade, and

6  Kriesel was either confused or disingenuous– about what "identification" means in this

7  context.

8          Put simply: identification means both who that person is (the person's name, date of

9  birth, etc.) and what that person has done (whether the individual has a criminal record,

10  whether he is the same person who committed an as-yet unsolved crime across town, etc.).

11  Who the person is can often be checked using fingerprints, but that does not preclude the

12  government from also checking that individual's identity in other ways.  An individual might

13  wear gloves at some point, thwarting fingerprint identification, or wear a mask, thwarting the

14  use of photographs.  The more ways the government has to identify who someone is, the

15  better chance it has of doing so accurately.  See Proposition 69, Dec. of Purpose, § II (e)

16  ("The state has a compelling interest in the accurate identification of criminal offenders, and

17  DNA testing at the earliest stages of criminal proceedings for felony offenses will help

18  thwart criminal perpetrators from concealing their identities"); see also Amerson, 483 F.3d at

19  87 (discussing "the potentially greater precision of DNA sampling and matching methods")

20  and Banks, 490 F.3d at 1192 (DNA "more advanced and accurate").  The second component

21  of identity, what the person has done, is no less important.  Nor is it new.  Plaintiffs could

22  point the Court to no case holding that once an individual has been identified through his

23  fingerprints, the government was barred from running those same fingerprints against crime

24  scene samples for investigative purposes (or from showing individuals' photographs to

25

26

27

28

16

**United States District Court**
For the Northern District of California

victims or witnesses).[10]  This use was helpfully characterized by one of the government's

declarants as "forensic identification."  See Konzak Decl. at ¶ 9.

ii.        Solution of Past Crimes

Thus, an additional government interest, contributing to the solution of past crimes, is

served by taking the DNA of arrestees.  Plaintiffs argue that expansion of the United

Kingdom's DNA database to include arrestee information "failed to increase the databank's

efficacy in solving crime."  MPI at 11 (citing Wallace Decl. at ¶¶ 13-26).  The government

responds that "maintaining arrestee samples resulted in a 74% increase in overall DNA

matches."  Opp. at 8 (citing Konzak Decl. at ¶ 15[11]).  Plaintiffs object to this interpretation,

Reply at 10-11, but in any case the Court need not rely on UK data.

The government has asserted that as of October 31, 2009, California's DNA Data

Bank Program has had 10,664 hits, and that of those hits, 291 have involved arrestee

---

[10]  Plaintiffs argued instead that even if the initial search is valid (to establish who the person is), running an individual's DNA profile against other DNA profiles in order to inculpate that individual in a crime (to establish what that person has done) is a second, unreasonable search.  In support of this argument they cite to Ferguson v. City of Charleston, 532 U.S. 67 (2001), in which the Supreme Court held that a state hospital's test of pregnant patients' urine, for the purpose of obtaining evidence of those patients' cocaine use that was then turned over to law enforcement, was an unreasonable search. That case is distinguishable.  It was not about whether an initial search became invalid when a subsequent, different search was performed; there, the "immediate objective . . . was to generate evidence for law enforcement purposes."  532 U.S. at 83.  In light of the immediate objective of the search, the Court found that the search did not fit within the "special needs" exception. Id. at 84.  Also distinguishable, and cited by Plaintiffs, is United States v. Mulder, 808 F.2d 1346 (1987), in which the Ninth Circuit held that a private search of an individual's belongings by a hotel does not implicate the Fourth Amendment, but the police's subsequent chemical analysis of tablets found in those belongings did.  The government there argued that the search was permissible either as a search of abandoned property or as part of the original, private search.  808 F.2d at 1348.  The court disagreed, distinguishing the case from Supreme Court authority permitting "on the spot" field tests of whether a substance was cocaine, because the chemical analysis "could have revealed an arguably private fact." Id. at 1348-49.  Here, both the initial (who is the person) and subsequent (what have they done) search are conducted by the government, and the subsequent "search" involves the mere matching of a legitimately-obtained DNA profile against other DNA profiles in a database– not a more detailed, more invasive search of the original DNA sample.  Accordingly, this Court finds more relevant the D.C. Circuit's analysis in Johnson v. Quander, 440 F.3d 489, 498 (D.C. Cir. 2006), holding that "the process of matching one piece of personal information against government records does not implicate the Fourth Amendment."  The court specifically held that accessing the DNA profiles in the CODIS database is not a separate search under the Fourth Amendment, adding that "the consequences of the contrary conclusion would be staggering," creating "an intolerable burden" on law enforcement "if every 'search' of an ordinary fingerprint database were subject to Fourth Amendment challenges." Id. at 499.

[11]  Konzak's declaration actually states that there was a 74% increase overall in DNA matches over the course of the program, "as a result of the increase in offender sampling and crime scene DNA activity."  Konzak Decl. at ¶ 15.

United States District Court
For the Northern District of California

submissions.  Konzak Decl. at ¶ 12.  The government further asserts that through September 2009, there have been over 71,400 offender hits within states and over 10,400 hits between states at the National level, about 1,038 of which are to arrestee submissions.  Id. at ¶ 13. These statistics suggest, unsurprisingly, that arrestee submissions contribute to the solution of crimes, but not to the same degree as convicted offender submissions.

Plaintiffs argue that the government's interest in the solving of past crimes is undermined, because the arrestee samples create significant backlogs, delaying the analysis of other samples.  Reply at 11.  But the government maintains that "the average processing time for arrestee samples is currently about 31 calendar days," and that "the increase in submissions from all adult arrestee collections has not increased our backlog 223%" but that "it has essentially stayed the same."  Konzak Decl. at ¶ 40.  Though Plaintiffs might be able to come forward at a later point in the litigation and establish that arrestee testing has created such a backlog that it has wholly undermined the government's interest in solving past crimes, it has not done so at this stage.

iii.    Prevention of Future Crimes

In addition, the government has articulated an interest in arrestee testing not present in Kincade: the prevention of future crimes.  Opp. at 8.  The government points to small studies done in Denver, Chicago, and Maryland, each of which focused on a handful of violent repeat offenders, and purported to show that had arrestee testing been done on those criminals early on, their subsequent violent crimes could have been prevented.  See Morrissey Decl., Speich Decl., and Powell Decl.  Plaintiffs object to this evidence as unreliable, and ask the Court to give it little weight.  See Objections.  The Court will give these studies little weight.  Plaintiffs have taken a closer look at several of the examples in these studies, noting that mandatory testing at these offenders' first convictions "would have generated the same result."  Reply at 8-9.  Though the government might be able to introduce more reliable evidence about the efficacy of arrestee DNA in preventing future crimes, it has

**United States District Court**
For the Northern District of California

1  not done so convincingly at this stage of the litigation. Accordingly this interest is not

2  strong.[12]

3           D.    Conclusion as to Likelihood of Success

4        Arrestees undoubtedly have a greater privacy interest than convicted felons, but

5  Plaintiffs have not shown that that interest outweighs the government's compelling interest in

6  identifying arrestees, and its interest in using arrestees' DNA to solve past crimes.

7  Accordingly, based on the evidence presently before the Court, California's DNA searching

8  of arrestees appears reasonable. Plaintiffs will argue that so holding conflicts with the Ninth

9  Circuit's decision in <u>Friedman</u>. However, <u>Friedman</u> did not engage in a thorough totality of

10  the circumstances test: it did not consider government interests beyond supervision, nor did it

11  examine the extent of Friedman's privacy interest. <u>See</u> 580 F.3d at 862-65 (Callahan, J.,

12  dissenting) (dissent, instead, conducted balancing analysis between individual's privacy

13  interests and government's legitimate interest in identification). Though <u>Friedman</u> warns that

14  "[n]either the Supreme Court nor our court has permitted general suspicionless, warrantless

15  searches of pre-trial detainees for grounds other than institutional security or other legitimate

16  penological interests," <u>id.</u> at 857, the Court finds that doing so here– certainly at this stage of

17  the litigation– is proper under the totality of the circumstances test required by <u>Rise,</u> <u>Kincade</u>

18  and <u>Kriesel</u>.

19        2.    <u>Irreparable Harm</u>

20        Plaintiffs argue that the inclusion of their DNA profiles in a searchable database

21  constitutes an ongoing violation of their rights. MPI at 13. The government responds that

22  because Plaintiffs have not been convicted of any crime, they could bring a suit under 42

23  U.S.C. § 1983 for damages, which would provide adequate compensation. Opp. at 13 (citing

24  <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994)). Nonetheless, "it has long been

25  established that the loss of constitutional freedoms, for even minimal periods of time,

---

[12] The government also claims an interest in exonerating the innocent. Opp. at 9, 14. At this stage of the litigation, this interest is not very strong. Though convicting the right person can theoretically serve to exonerate (or obviate the risk of investigating and prosecuting) the wrong person, the government has not yet introduced any evidence that the taking of arrestees' DNA has led to either an increase in exonerations or a decrease in false accusations/convictions.

United States District Court
For the Northern District of California

1    unquestionably constitutes irreparable injury." See Mills v. District of Columbia, 571 F.3d

2    1304, 1312 (D.C. Cir. 2009) (internal quotations omitted).  If the Court found that the harm

3    Plaintiffs claim was likely, it would be irreparable.  However, because it appears that

4    Plaintiffs are unlikely to prevail on the merits of their constitutional arguments, the Court

5    does not find that they are facing irreparable harm.

6        3.    Balance of Equities

7        Plaintiffs assert that the balance of the equities tips in their favor, because "[u]nless

8    they are enjoined, Defendants will invade the privacy of a huge class of persons who enjoy a

9    presumption of innocence and an expectation of privacy in [their DNA profiles]," whereas

10   "[the government] will not suffer any comparable harm."  MPI at 13-14.  Plaintiffs further

11   argue that if an injunction is granted, the government "will still continue to identify arrested

12   persons by taking their fingerprints and will continue to be able to collect DNA Samples

13   immediately upon conviction."  Id. at 14.

14       This argument assumes that the DNA sampling of arrestees is an unconstitutional

15   invasion of privacy– a position this Order has not adopted.  In addition, Plaintiffs' argument

16   assumes that fingerprints and DNA are equally effective means of identification.  But see

17   Amerson, 483 F.3d at 87 (discussing "the potentially greater precision of DNA sampling and

18   matching methods"); and Banks, 490 F.3d at 1192 (DNA "more advanced and accurate").  It

19   also assumes that the collection of arrestee samples does not increase the DNA databases'

20   efficacy, a position at odds with the data provided by the government.  See Konzak Decl. at

21   ¶¶ 12, 13.

22       Most problematic, Plaintiffs' argument that the government would not suffer

23   comparable harm overlooks the tremendous expense that appears likely if an injunction is

24   granted.  The government points to the over $4.9 million it has spent on implementing the

25   statute, Opp. at 15, but  that money was apparently spent on increased laboratory space that

26   could be used for other DNA testing even if the injunction was granted, see Konzak Decl. at

27

28

United States District Court
For the Northern District of California

¶ 17.[13]  More troubling, although Plaintiffs claim that "Defendants can simply exclude arrestee profiles from their searches," Reply at 14, they have asked the Court to enjoin Defendants from "seizing, searching, analyzing, or making any use of DNA samples or analysis of [arrestee] DNA samples."  MPI at 1.  This would– it would seem– require the government to retrain law enforcement officers across the state,[14] research which individuals in the arrestee index have subsequently been convicted of a crime, and remove all other arrestee profiles from CODIS.  See Konzak Decl. at ¶¶ 31-34.  This cost appears to be significant.

In light of these various factors, the balance of the equities tips in the government's favor.

4.    Public Interest

Plaintiffs argue that "preventing wholesale violations of the Constitution serves the public interest."  MPI at 14.  In American Federation of Teachers– West Virginia, AFL-CIO v. Kanawha County Board of Education, 592 F. Supp. 2d 883, 906 (S.D. W. Va. 2009) (internal quotations omitted), the court held that "[a]n injunction would prevent the likely infringement of petitioners' rights under the Fourth Amendment and upholding constitutional rights surely serves the public interest."  However, here Plaintiffs have not demonstrated a likely infringement of their Fourth Amendment rights.  Moreover, the government identifies public interests in (1) swiftly and accurately solving crimes, and (2) seeing the public's vote honored.  Opp. at 13-14.  This Order has already addressed the impact of arrestee DNA sampling on the solving of crime, but the public interest in Proposition in 69 is also notable.  Whatever the parties or even the Court think of the wisdom of Proposition 69, California voters approved it with 62.1% of the vote.  Powell Decl. at ¶ 3, Ex. B.  Thus, the public interest likely favors the government.

---

[13] The government has also apparently spent over $3.1 million to upgrade the number and types of instruments used at the labs, id. at ¶ 25, though again, that investment would presumably not be in vain.

[14] The government has reportedly spent $252,000 training law enforcement as to how to conduct DNA testing (and presumably, on whom to conduct such testing).  See Willie Decl. at ¶ 6.

**United States District Court**
For the Northern District of California

### CONCLUSION

Plaintiffs have not demonstrated that they are likely to succeed on the merits, or that the balance of the equities tips in their favor.  The Court therefore DENIES the motion for a preliminary injunction.

**IT IS SO ORDERED.**

Dated: December 23, 2009

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE