IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH AIDA HASKELL, et al.,

        Plaintiffs,

    v.

EDMUND G. BROWN, et al.,

        Defendants.

Case No. 09-cv-04779-CRB

**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**

In 2014, Defendants brought a Motion for Judgment on the Pleadings, arguing that this case, which challenges California's DNA Act, is foreclosed by Maryland v. King, 133 S. Ct. 1958 (2013). See Mot. (dkt. 151); see also Opp'n (dkt. 159); Reply (dkt. 162); 2014 Mot. Hearing (dkt. 167). The Court did not rule on the motion, however, instead staying the case pending final resolution of a similar challenge to California's DNA Act in state court. See Order Staying Case (dkt. 169). In April of 2018, the California Supreme Court, in People v. Buza, 4 Cal. 5th 658 (2018), upheld California's DNA Act under both federal and California law as to the felony arrestee in that case. This Court lifted its stay, and sought the parties' views on Buza. See Order Lifting Stay and Directing Briefing (dkt. 170); see also Pls. Br. (dkt. 171); Defs. Br. (dkt. 172); Order Directing Briefing and Setting Hearing (dkt. 173); Pls. Reply (dkt. 175); Defs. Reply (dkt. 176); 2018 Mot. Hearing (dkt. 177). As explained below, the Court now GRANTS Defendant's motion under King and consistent with Buza.

## I.    BACKGROUND

The Court's December 2009 Order Denying Motion for Preliminary Injunction (dkt.

78) included a lengthy background section, which the Court will not replicate here. In sum, Plaintiffs are individuals who were arrested on felony crimes and whose DNA samples were taken at the station house. FAC (dkt. 56) ¶¶ 13–25. No charges were filed against Plaintiffs Haskell, Ento, or Desai after their arrests. Id. ¶¶ 14, 17, 22. Plaintiffs brought suit in October 2009, alleging that California Penal Code section 296(a)(2)(C), which provides for the mandatory DNA sampling of felony arrestees in California, is an illegal search and seizure under the Fourth Amendment, a violation of their rights to substantive due process under the Fourteenth Amendment, and a violation of their rights to procedural due process under the Fourteenth Amendment. See generally Compl. (dkt. 1). Plaintiffs amended their complaint in December 2009, see generally FAC, and the Court denied Plaintiffs' Motion for Preliminary Injunction that same month, see Order Denying Motion for Preliminary Injunction. A Ninth Circuit panel affirmed. See Haskell v. Harris, 669 F.3d 1049 (9th Cir. 2012).

While this case was pending before an en banc panel, the Supreme Court issued the King decision, upholding Maryland's arrestee DNA law. See generally King, 133 S. Ct. at 1958. The Maryland law authorizes the collection of DNA from individuals "charged with . . . a crime of violence or an attempt to commit a crime of violence; or . . . burglary or an attempt to commit burglary." Id. at 1967. It prohibits law enforcement from processing the DNA sample or placing it into a database without consent until the arrestee is arraigned. Id. And it provides that the sample is to be immediately destroyed if all qualifying charges are later found to be without probable cause, if a criminal action against the individual does not result in conviction, if the conviction is reversed or vacated and no new trial permitted, or if the individual is pardoned. Id. The Supreme Court, rather than limit its discussion to the Maryland law, noted that twenty-eight states "have adopted laws similar to the Maryland Act" and explained that "[a]lthough those statutes vary in their particulars, such as what charges require a DNA sample, their similarity means that this case implicates more than the specific Maryland law." Id. at 1968.

The Supreme Court held that a DNA swab procedure is a search subject to the

2

Fourth Amendment; in analyzing that search, the Court weighed five government interests against the individual arrestees' interest in privacy. Id. at 1970–79. The Court focused primarily on "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody," id. at 1970, explaining that "'[i]n every criminal case, it is known and must be known who has been arrested and who is being tried.'" Id. at 1971 (quoting Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty., 542 U.S. 177, 191 (2004)). The Court observed that it "must give great weight both to the significant government interest at stake in the identification of arrestees and to the unmatched potential of DNA identification to serve that interest," and held that, balanced against the "minimal" "intrusion of a cheek swab" and the arrestee's "necessarily . . . diminished" expectations of privacy, the search was reasonable. Id. at 1977–78. The Court therefore concluded: "When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." Id. at 1980 (emphasis added).

Following King, the Ninth Circuit held that this Court did not err in denying a preliminary injunction on behalf of anyone arrested for, or charged with, a felony. Haskell v. Harris, 745 F.3d 1269, 1271 (9th Cir. 2014) (en banc) (per curium). The Ninth Circuit declined to enter a narrower injunction urged by Plaintiffs, adding that "[i]f plaintiffs believe they're entitled to a preliminary injunction as to a smaller class, they are free to seek it from the district court and we will review it if and when it is presented to us." Haskell, 745 F.3d at 1271. Judge Milan Smith concurred, asserting that the majority opinion "vaguely implies that something of Plaintiffs' lawsuit may survive King" but that, under King, "[t]his case is over." See id. at 1271, 1275 (Smith, J., concurring).

This Court then stayed this case while awaiting the California Supreme Court's decision in People v. Buza, 4 Cal. 5th 658 (2018). See Order Staying Case. That decision came in April. See Buza, 4 Cal. 5th 658. The defendant in Buza was arrested for arson

3

and related felonies; at booking, he refused to provide a DNA specimen as required by the DNA Act. 4 Cal. 5th at 684. He was convicted of the arson-related felonies as well as the misdemeanor offense of refusing to provide a DNA sample. Id. After the Court of Appeal twice reversed the misdemeanor conviction, the California Supreme Court reversed the Court of Appeal, based on King. Id. at 670 ("King . . . has significantly altered the terms of the debate."). Although the defendant argued that there were "three features of the DNA Act . . . that, in his view, distinguish this case from King," id. at 694, the court disagreed, id. at 683.[1] Although the court began by framing the issue quite broadly, see id. at 669 ("We granted review to decide whether the collection and analysis of forensic identification DNA database samples from felony arrestees . . . violates . . . the Fourth Amendment to the United States Constitution"), it then narrowed its focus: "The sole question before us is whether it was reasonable, under . . . the Fourth Amendment. . . to require the defendant in this case to swab his cheek as part of a routine jail booking procedure following a valid arrest for felony arson," id. at 691 (emphasis added). In fact, the Buza court noted that "a group . . . in federal court have already challenged the law's application to those who are never charged with any crime," citing this case. Id. at 693.

At this Court's direction, the parties submitted supplemental briefs about the impact of the Buza opinion. See Pls. Br.; Defs. Br.; Pls. Reply; Defs. Reply. Unsurprisingly, Defendants urge the Court to grant their motion for judgment on the pleadings, arguing that King controls, see Defs. Br. at 2, and Plaintiffs urge the Court to deny the motion, arguing that they were arrested but never charged, and so neither King nor Buza apply, see Pls. Br. at 2.

## II. LEGAL STANDARD

Judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is proper "when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter

---

[1] The court went on to conclude that the DNA Act is also constitutional under the California Constitution, an issue not before this Court. See id. at 691; FAC (dkt. 56).

of law." <u>Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.</u>, 896 F.2d 1542, 1550 (9th Cir. 1990) (citation omitted). When a party invokes Rule 12(c) to raise the defense of failure to state a claim, the motion faces the same test as a motion under Rule 12(b)(6). <u>Wood v. Cnty. of Alameda</u>, 875 F. Supp. 659, 661 (N.D. Cal. 1995). "A dismissal on the pleadings for failure to state a claim is proper only if 'the movant clearly establishes that no material issue of fact remains to be resolved. . . .'" <u>McGlinchy v. Shell Chem. Co.</u>, 845 F.2d 802, 810 (9th Cir. 1988) (citing <u>Doleman v. Meiji Mut. Life Ins. Co.</u>, 727 F.2d 1480, 1482 (9th Cir. 1984)).

## III.     DISCUSSION

Defendants argue that <u>King</u> forecloses this case. <u>See</u> Mot. at 8–18; Reply at 1–10.[2] Plaintiffs have taken different positions in opposing that argument. In 2014, they asserted that the DNA Act is unconstitutional, despite <u>King</u>, both because of differences between the California law and the Maryland law at issue in <u>King</u>, and because the government interests identified in <u>King</u> do not apply with the same force to individuals arrested but not charged. <u>See</u> Opp'n at 6–14. In 2018, they have taken a new position, arguing that while it is "still an open question after" <u>King</u> whether the DNA Act is unconstitutional as to individuals arrested and not charged, "[e]ven if the Fourth Amendment allows the government to seize a DNA sample from everybody arrested on suspicion of a felony, once the government determines that it will not prosecute a person, or charges are dismissed, the government's interests no longer justify analyzing that sample to obtain a DNA profile." Pls. Br. at 1. The Court addresses Plaintiffs' arguments in reverse order: (A) that while taking a DNA sample at booking is permissible, analyzing it is not; (B) that the government interests in <u>King</u> are not present here; and (C) that there are significant

---

[2] Defendants also argue that the DNA Act does not violate Plaintiffs' rights to substantive or procedural due process. Mot. at 18–21. Plaintiffs do not address due process in their Opposition brief, and indeed suggest that they are no longer making such a challenge. <u>See</u> Opp'n at 6 ("The question before this court is therefore whether any of the plaintiffs have stated a claim that the law violates the Fourth Amendment as applied to their arrests."). Nor did they raise the issue at the motion hearing. Accordingly, the Court considers the due process claims waived. <u>See</u> <u>Jenkins v. County of Riverside</u>, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (plaintiff abandoned claims by not raising them in opposition to motion for summary judgment).

differences between the Maryland and California laws.

### A.    Taking But Not Analyzing DNA

Plaintiffs assert in their briefing, and repeated at the motion hearing, that they are "propos[ing]" a "rule" that would allow law enforcement to seize samples from all felony arrestees, but that would prevent law enforcement from analyzing those samples until a prosecutor has filed charges.  Pls. Br. at 7, 8.  The Court rejects this new position.

First, while nothing prevents Plaintiffs from proposing rules, the Court is not in the business of weighing legislative proposals.  The DNA Act says what it says.  It allows for the taking and analysis of a felony arrestee's DNA at booking.  See FAC ¶¶ 45–49; Cal. Penal Code §§295–299.5.  While a different system might be better, or worse, the Court's task is to assess the constitutionality of the DNA Act as written.

Second, Plaintiffs' new position is inconsistent with King.  Plaintiffs are clever to argue that, while it might make sense to take an arrestee's DNA sample at booking, the government cannot justify analyzing that sample once the arrestee is no longer accused of a crime.  See Pls. Br. at 4–8.  This new position, allowing for early DNA collection, eliminates some of Defendants' 2014 arguments—for example, that if law enforcement did not take a DNA sample at booking, "[i]ndividuals out of custody prior to charging have every incentive to flee knowing that a DNA sample taken later after charging will likely connect them to their unsolved violent crimes."  See Reply at 8; id. n.4; see also Buza, 4 Cal. 5th at 676 ("there are practical reasons for collecting the required DNA sample at the time of booking. . . . if the arrestee is released pending adjudication, officials may not have another opportunity.").  But King does not separate out the two steps in DNA identification.

King held that the government's interests attach when an individual is taken into custody.  133 S. Ct. at 1966 ("collection and analysis of a DNA sample from persons arrested, but not yet convicted, on felony charges"); id. at 1971 ("[w]hen probable cause exists to remove an individual from the normal channels of society and hold him in legal custody"); id. ("real interest in identification at stake when an individual is brought into

6

custody."); id. ("[a] suspect's criminal history is a critical part of his identity that officers should know when processing him for detention."); id. at 1980 ("context of arrest gives rise to significant state interests in identifying respondent"); see also Haskell, 745 F.3d at 1274 (M. Smith, concurring) ("The government's interest in identifying arrestees attaches 'when an individual is brought into custody,' . . . irrespective of whether the suspect is ultimately charged.") (quoting King, 133 S. Ct. at 1971); Buza, 4 Cal. 5th at 677 ("That interest is one that attaches as soon as the suspect is 'formally processed into police custody'") (quoting King, 133 S. Ct. at 1971).

King also held that, at the time that interest attaches—that is, "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody"—law enforcement may both "tak[e] and analyz[e] a cheek swab of the arrestee's DNA." 133 S. Ct. at 1980. "Taking and analyzing" the cheek swab is, the Court held, "like fingerprinting and photographing, a legitimate police booking procedure." Id. The Supreme Court spoke of both the taking of an arrestee's DNA and the analysis of that DNA as part of the broader process of identification. As Buza explained, "'DNA identification' . . . necessarily involves both taking and analyzing the sample." 4 Cal. 5th at 677. It would make little sense for the Court to have stated that "[a] suspect's criminal history is a critical part of his identity that officers should know when processing him for detention," King, 133 S. Ct. at 1971, if it meant that officers are only permitted to take, rather than analyze, DNA at booking: it is the DNA analysis and the database search that provide officers with the arrestee's criminal history.

The Court's treatment of the taking and analyzing as part of a single "identification" process, rather than two independent searches, is consistent with its explanation that "the 13 CODIS loci are not themselves evidence of any particular crime, in the way that a drug test can by itself be evidence of illegal narcotics." See id. at 1972. Plaintiffs argue that "[j]ust as the authority of the police to seize a cell phone incident to arrest does not mean that they may search it without making a further showing, their authority to seize a DNA

7

sample does not mean they can search (or continue to search) it unless they have valid justification for doing so." Pls. Br. at 6 (citing Riley v. California, 134 S. Ct. 2473 (2014)). But law enforcement officers conduct drug tests and search phones to look for evidence of crime. See King, 133 S. Ct. at 1972; Riley, 134 S. Ct. at 2484 (impermissible to search data on cell phone seized incident to arrest, because such data does not implicate "concerns for officer safety or evidence preservation"). Law enforcement analyzes a DNA sample taken at booking not to look for evidence of the crime for which the individual was arrested, but to compare the arrestee's unique DNA identifier against "records already in their valid possession"—a tasked aimed at discovering "who has been arrested." See King, 133 S. Ct. at 1971–72.[3]

Plaintiffs rely on a recent Supreme Court decision holding that, in the context of a traffic stop, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed," see Pls. Br. at 4 (quoting Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015)). The Court in Rodriguez explained that "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" 135 S. Ct. at 1615. Accordingly, the Court held that, although it was permissible for an officer to make "ordinary inquiries incident to [the traffic] stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," a dog sniff intended to detect "evidence of ordinary criminal wrongdoing," was not traffic-related and therefore improperly prolonged the stop. Id. Rodriguez does not apply, because the context and purpose of booking a felony arrestee at the station house is so unlike a traffic stop, and because identifying an arrestee through his DNA is more like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and

---

[3] While Plaintiffs note that they "have consistently argued that the analysis of their DNA is a distinct search," see Pls. Reply at 1 (citing FAC ¶ 79), that allegation is a legal conclusion not entitled to any weight, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (citation omitted) (court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

proof of insurance" than it is a dog sniff in search of evidence.

Plaintiffs' further analogies of a parole search, Pls. Reply at 3, or of the search incident to arrest discussed in Arizona v. Gant, 129 S. Ct. 1710 (2009),[4] likewise fall flat, because King did not view DNA analysis as a separate search for evidence. See King, 133 S. Ct. at 1972; Buza, 4 Cal. 5th at 673 (observing that the Supreme Court in King held "that analysis of the DNA sample, once collected, does not result in a privacy intrusion that violates the federal Constitution."); cf. Johnson v. Quander, 440 F.3d 489, 498 (D.C. Cir. 2006) ("the process of matching one piece of personal information against government records does not implicate the Fourth Amendment"); id. at 499 ("intolerable burden if every 'search' of an ordinary fingerprint database were subject to Fourth Amendment challenges.").

Plaintiffs suggest that it is disingenuous to pair the taking and analysis of DNA, because of the time that elapses between the two steps. See, e.g., Opp'n at 7–9.[5] Although California law permits analysis of DNA samples without delay, Plaintiffs asserted in 2014 that it takes approximately two months for law enforcement to upload a DNA sample into CODIS after collection. See Opp'n at 8 n.5; FAC ¶¶ 60–62. Indisputably, the time between the two steps is shrinking. See Buza, 4 Cal. 5th at 677 ("in California it has typically taken much longer—at the time of briefing, an average of 30 days—to generate an identification profile from an arrestee's DNA sample"); see also Defs. Reply at 8 n.6 (representing that the lag in California is currently eighteen days). And it is not difficult to imagine that what once took months will soon take minutes. See, e.g., King, 133 S. Ct. at 1977 (noting that the FBI is testing devices with a 90 minute processing time); see also id. ("[n]ew technology will only further improve its speed and therefore its effectiveness.").[6]

---

[4] In Gant, the Court held that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle,'" but that law enforcement cannot simply search an arrestee's car for evidence of wrongdoing when there is no evidentiary basis to do so. 129 S. Ct. at 1719 (quoting Thornton v. United States, 541 U.S. 615, 632 (Scalia, J., concurring)).

[5] Relatedly, at the motion hearing, Plaintiffs stated that while DNA analysis might be a routine part of a booking procedure, "you don't have a booking procedure lasting for weeks."

[6] Plaintiffs asserted at the motion hearing that if law enforcement could analyze the DNA while

United States District Court
Northern District of California

Even so, the Supreme Court has already considered and rejected this argument. In King, the Court noted that "respondent's primary objection to this analogy is that DNA identification is not as fast as fingerprinting, and so it should not be considered to be the 21st-century equivalent." Id. at 1976.[7] But the Court explained that "rapid analysis of fingerprints is itself of recent vintage," that fingerprints used to take "weeks or months to process," and that it was not the technology that sped up fingerprint analysis that rendered fingerprint analysis constitutional. Id. "The question of how long it takes to process identifying information obtained from a valid search goes only to the efficacy of the search for its purpose of prompt identification, not the constitutionality of the search." Id. Buza echoed this view, conceding that "[a] DNA profile is not, at least under present technological conditions, generated immediately or nearly immediately, in the manner of fingerprints," but stating that "[s]uch delays have not been thought to undermine the basic identification purposes of the information." 4 Cal. 5th at 688.

Accordingly, the Court rejects Plaintiffs' new position that even if it is permissible to take an arrestee's DNA at booking, it is unconstitutional to analyze that sample until or unless the arrestee is charged with a crime. See Pls. Br. at 1. The Court now turns to Plaintiffs' original arguments distinguishing King.

## B. Weighing of Interests

### 1. Government Interests

Plaintiffs insist that "only one of the five government interests that King identified as legitimate can support taking, analyzing, and retaining DNA from people who are not charged with any offense or are discharged for lack of probable cause before the sample is sent to the laboratory, analyzed, and uploaded into CODIS." Opp'n at 6; see also Pls. Br.

---

still processing the arrestees, "we lose." That is not the case presently.

[7] At the motion hearing here, Plaintiffs objected to the fingerprint-DNA analogy for an additional reason: because analyzing fingerprints only involves looking at ink, while analyzing DNA involves chemicals—purportedly a more advanced technology. Both involve analysis, however. That one analyzes loops, whorls, and arches, while the other analyzes repeated DNA sequences is a distinction without a difference. See id. at 1972 ("the only difference between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides.").

at 4 ("With one possible exception, these interests all relate to processing a defendant through the criminal-justice system," and all disappear when a defendant is no longer part of the criminal-justice system). Plaintiffs thus reject as inapplicable the government interests <u>King</u> recognized in (a) identification of arrestees, (b) safety for facility staff and detainees, (c) availability for trial, and (d) proper bail/release determinations, although they concede that (e) "taking DNA from arrestees may result in freeing a person wrongfully imprisoned for some other crime." Opp'n at 7–9; <u>see also</u> Pls. Br. at 5 ("Although [exonerating the innocent] may apply to people who are not ultimately prosecuted for a crime, it cannot in itself support seizing and searching DNA from an arrestee."). Plaintiffs understate the government's interests.

To be clear, as discussed above, <u>King</u> held that the government's interests attach when an individual is taken into custody. <u>See</u> 133 S. Ct. at 1971. When an individual is taken into custody, prosecutors have not yet determined whether that individual will be charged. Analyzing the government's interests at the time of booking, but with knowledge not available at the time of booking (i.e., that an individual will not subsequently be charged), is putting one's thumb on the scales. It also ignores the possibility that identifying information revealed by DNA analysis could actually guide a prosecutor's determination of <u>whether</u> to charge.[8] <u>Buza</u> observed that "[e]ven if a DNA profile is not generated until weeks or months after the initial booking, the information it yields about the arrestee and his criminal history can still have an 'important bearing' on the processing of an arrestee—whether, for example, to revisit an initial determination to release the arrestee or to impose new release conditions." 4 Cal. 5th at 689. Nonetheless, even as to individuals arrested but not subsequently charged, the government's interest at booking is

---

[8] For example, at the motion hearing, the Court asked Plaintiffs' counsel about a hypothetical arrest of an individual in possession of a firearm and a small quantity of drugs. The individual says that his name is Jones and that he has a license for the firearm. His DNA results come back and show that his name is actually Smith, and that he is a convicted felon who was therefore not permitted to carry a firearm. The Court stated that the government has an interest in knowing that the individual arrested was a felon in possession of a firearm. Plaintiffs' counsel rejected the government interest at issue as "a generalized interest in crime control," but the Court views it as one way that DNA analysis could inform a charging decision.

weighty.

Certainly the government interest that <u>King</u> identified in "ensuring that the custody of an arrestee does not create inordinate 'risks for facility staff, for the existing detainee population, and for a new detainee'" is not relevant when an arrestee will be released from custody before a DNA result is available. <u>See</u> 133 S. Ct. at 1972. Similarly, the government interest that <u>King</u> identified in "'ensuring that persons accused of crimes are available for trials,'" <u>id.</u> at 1972–73, does not apply where there will be no trial. However, the other three government interests <u>King</u> identified still apply.

### a. Identification

The government has a significant interest in identification of arrestees. <u>Id.</u> at 1971 ("[i]n every criminal case, it is known and must be known who has been arrested and who is being tried.") (internal quotation marks omitted); <u>see also</u> <u>Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington</u>, 132 S. Ct. 1510, 1512 (2012) (jail operators "know little at the outset about [an] arrestee," who "may be carrying a fake ID or lie about his identity."); Proposition 69, Dec. of Purpose, § II (e) ("The state has a compelling interest in the accurate identification of criminal offenders, and DNA testing at the earliest stages of criminal proceedings for felony offenses will help thwart criminal perpetrators from concealing their identities."). Plaintiffs here complain that it is "convoluted" to claim that connecting an individual with his past crimes is part of identification. <u>See</u> Pls. Reply at 2. Though that might have been a valid criticism when this Court held in 2009 that "identification means both who that person is . . . and what that person has done," <u>see</u> Order Denying Motion for Preliminary Injunction at 16, it no longer is in light of the Supreme Court's holding that "[a]n individual's identity is more than just his name or Social Security number. . . . A suspect's criminal history is a critical part of his identity," <u>King</u>, 133 S. Ct. at 1971. The Court explained that "[p]olice already seek this crucial identifying information" by taking photographs and comparing them to sketch artists' drawings, showing mugshots to witnesses, and running fingerprints through electronic databases of criminals and unsolved crimes, and it concluded that "the only difference

between DNA analysis and the accepted use of fingerprint databases is the unparalleled accuracy DNA provides." Id. at 1971–72.

The government interest in identifying arrestees—both who they are and what they have done—is present even if the arrestee is not ultimately charged with the felony for which he has been arrested. Law enforcement still has a right to know "who has been arrested" even if there is no "who is being tried." See id., 133 S. Ct. at 1971; see also id. at 1970 ("need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody."). Such an individual might still be linked to a previous crime. See id. at 1971 ("It is a common occurrence that people detained for minor offenses can turn out to be the most devious and dangerous criminals."). The government's interest in knowing the criminal histories of its arrestees is served by fingerprinting, photographing, and DNA analysis. Id. at 1971–72. Plaintiffs do not argue that the government cannot take the fingerprints or photographs of individuals arrested but not subsequently charged. Cf. Rise v. State of Or., 59 F.3d 1556, 1560 (9th Cir. 1995) ("everyday 'booking' procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether investigation of the crime involves fingerprint evidence."); Smith v. United States, 324 F.2d 879, 882 (D.C. Cir. 1963) ("elementary that a person in lawful custody may be required to submit to photographing, and fingerprinting") (internal citations omitted). DNA is no different.[9]

### b. Assessing Danger

Another government interest the Court recognized in King is accurately assessing "the danger [an arrestee] poses to the public," which will "inform a court's determination whether the individual should be released on bail." King, 133 S. Ct. at 1973. While bail determinations do not apply to an individual never charged, Defendants reason persuasively that "[w]hile the individual is out of custody on bail or . . . release, DNA

---

[9] Plaintiffs suggested at the hearing that an individual would not expect the government to analyze his DNA once he has been released from custody. The Court disagrees; it would not be a reasonable expectation that once an arrestee gave a sample, law enforcement would not look at it.

testing results may identify the arrestee as a violent criminal who should not be released in the community to reoffend." Reply at 8. Taking the arrestee's DNA at booking gives law enforcement an early view into the arrestee's dangerousness. See King, 133 S. Ct. at 1974 ("additional and supplemental data establishing more about the person's identity and background can provide critical information relevant to the conditions of release and whether to revisit an initial release determination."). This interest is therefore present.

### c. Exoneration

Finally, the Court in King recognized that the government has an interest in exoneration: "the identification of an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense." Id. at 1974. Plaintiffs concede, as they must, that this interest "may apply" to individuals arrested but not charged. Opp'n at 8; Pls. Br. at 5. But they dismiss the interest as an "afterthought" by the Court, assert that it cannot alone justify the invasion of an individual's privacy, and cite this Court's Order Denying Preliminary Injunction, which noted that the government had not identified evidence of increased exonerations. Opp'n at 8–9. The government's interest in exoneration commands one full paragraph in the King opinion, see 133 S. Ct. at 1974 (quoting J. Dwyer, P. Neufeld, & B. Scheck, Actual Innocence 245 (2000)), but it is not an afterthought. The Court again spoke of protecting the innocent a few pages later, noting that "[b]y identifying not only who the arrestee is but also what other available records disclose about his past to show who he is, the police can ensure that they have the proper person under arrest . . . and, just as important, they can also prevent suspicion against or prosecution of the innocent." Id. at 1977 (emphasis added).

Moreover, despite the lack of evidence here (the motion is based on the pleadings, after all), there is no question either that DNA evidence leads to exonerations, or that exonerations are a worthy interest. See Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 55 (2009) (referring to DNA's "unparalleled ability both to exonerate the wrongly convicted and to identify the guilty"); United States v. Kincade, 379

F.3d 813, 839 n.38 (9th Cir. 2004) ("the CODIS database can help absolve the innocent just as easily as it can inculpate the guilty. . . . use of CODIS promptly clears thousands of potential suspects—thereby preventing them from ever being put in that position, and 'advancing the overwhelming public interest in prosecuting crimes accurately'") (quoting Rise, 59 F.3d at 1561); see also Buza, 4 Cal. 5th at 666 (noting Prop. 69 goal of "exonerating persons wrongly suspected or accused of crime"). Indeed, it is a truism that there is no greater injustice than the wrongful conviction of innocent people. Whether the government interest in exoneration can "alone" justify the DNA searches here is beside the point, given the other government interests present.

The Supreme Court in King gave "great weight" to the "significant government interest at stake" in arrestee DNA analysis. 133 S. Ct. at 1977. The government's interests in identifying arrestees, in assessing their dangerousness, and in exonerating the innocent, present in King, are also present in the case of individuals arrested for felonies but not charged. The government's interest here is therefore still weighty.

### 2. Individual Interest

As to the individual interest, Plaintiffs do not argue that it is any different here than it was in King. See generally Opp'n; Pls. Br.; Pls. Reply.

King found that "the intrusion of a cheek swab to obtain a DNA sample is a minimal one." 133 S. Ct. at 1977. It found that "[t]he expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope,'" id. at 1978 (quoting Bell v. Wolfish, 441 U.S. 520, 557 (1979)), and that "[b]oth the person and the property in his immediate possession may be searched at the station house," id. (quoting United States v. Edwards, 415 U.S. 800, 803 (1974)); see also Kincade, 379 F.3d at 837 (holding that "the DNA profile . . . established only a record of defendant's identity—otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense (indeed, once lawfully arrested and booked into state custody)"). The Court noted that "[a] search of the detainee's person when he is booked into custody may involve a relatively extensive exploration," including

1    "requiring at least some detainees to lift their genitals or cough in a squatting position."

2    King, 133 S. Ct. at 1978 (internal quotation marks and citations omitted).  And the Court

3    held that, compared to such procedures, the "brief intrusion" of a buccal swab "does not

4    increase the indignity already attendant to normal incidents of arrest."  Id. at 1979.

5        The Court in King further held that the analysis of an arrestee's swab "did not

6    intrude on [arrestees'] privacy in a way that would make [their] DNA identification

7    unconstitutional," as the CODIS loci "do not reveal the genetic traits of the arrestee," "they

8    are not tested for that end," and the Maryland law (like the California law here) "provides

9    statutory protections that guard against further invasion of privacy."  Id. at 1979; Cal.

10   Penal Code § 299.5.

11       Weighing the government's significant interest here against the individual's modest

12   interest, such searches are reasonable.  See King,133 S. Ct. at 1980 ("DNA identification

13   of arrestees is a reasonable search that can be considered part of a routine booking

14   procedure."); see also Kincade, 479 F.3d at 864–65, 866 (Reinhardt, J., dissenting) ( "in

15   the face of 'monumental' government law enforcement interests, I find it difficult to

16   understand when suspicionless searches would be found to violate the Fourth

17   Amendment.").

18       **C.    Differences between the California and Maryland Laws**

19       Plaintiffs next seek to distinguish King based on three differences between the

20   California law at issue here and the Maryland law upheld there.  Those differences are: (1)

21   arrestee DNA samples are analyzed before arraignment in California; (2) more crimes

22   qualify for mandatory DNA analysis in California; (3) records and samples are not

23   automatically expunged in California.  See Opp'n at 10–14.  The defendant in Buza sought

24   to distinguish King on precisely the same three grounds, with no success.  See 4 Cal. 5th at

25   674 ("none of the differences to which defendant points meaningfully alters the

26   constitutional balance struck in King.").  The Court likewise does not find any of the three

27   differences constitutionally significant.

28

### 1. Timing of Analysis

The biggest difference Plaintiffs point to is the timing of DNA analysis: in Maryland, DNA samples are taken at booking but not analyzed until an individual is arraigned, while in California, DNA is both taken and analyzed (albeit with some lag time) at booking. See Opp'n at 10 (citing King, 133 S. Ct. at 1967). The practical result of this difference is that Maryland's law has an added layer of protection for individuals that California's law does not.

The Supreme Court was aware of this difference between various states' laws. Not only did it recognize that "[t]wenty-eight States and the Federal Government have adopted laws similar to the Maryland Act authorizing the collection of DNA from some or all arrestees" and that "those statutes vary in their particulars," but the ACLU's amicus brief specifically highlighted that "[m]any jurisdictions take DNA from persons never charged with a crime." See King, 133 S. Ct. at 1968; Brief of Amici Curiae American Civil Liberties Union et al. Supporting Respondent at *54, Maryland v. King, 133 S. Ct. 1958 (2013) (No. 12-207), 2013 U.S. S. Ct. Briefs LEXIS 751. The brief explained that Maryland's law differed from some jurisdictions because it permitted DNA collection "from persons charged with, not merely arrested for, a crime." Id. It went on to explain that "[o]ther jurisdictions mandate collection 'immediately following arrest, or during the booking . . . process as soon as administratively practicable after arrest,' with the samples analyzed as soon thereafter as possible," citing to the California law. Id.

That different states analyze DNA at different times did not concern the Supreme Court. See Buza, 4 Cal. 5th at 677 ("reasoning of King itself does not lend substantial support to the argument that [delay of sample analysis until charges are filed] is required under these circumstances."). As discussed above, the Court did not find it meaningful that Maryland's taking and analysis occur at different times. It held instead that "[w]hen officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing"—not just taking—"a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a

United States District Court
Northern District of California

legitimate police booking procedure that is reasonable under the Fourth Amendment."
King, 133 S. Ct. at 1980; see also id. at 1966 (framing the question as "whether the Fourth Amendment prohibits the <u>collection and analysis</u> of a DNA sample from persons <u>arrested</u>, but not yet convicted, on felony charges.") (emphasis added).

Indeed, far from suggesting that law enforcement should postpone learning an arrestee's criminal history, the Court envisioned that DNA identification would take place at the time of booking.  See, e.g., id. at 1971 ("A suspect's criminal history is a critical part of his identity that officers should know when processing him for detention."); see also DNA Saves Amicus Brief (dkt. 150-1) at 7 ("King relied on the government interest in identifying all people who have been taken into custody, not merely those who have had charges filed after a judicial hearing.").  The court in Buza likewise acknowledged that delaying the collection or processing of samples until after a judicial probable cause finding or arraignment could pose a "meaningful risk of interference with the central interest identified in King: the accurate identification of arrestees who are taken into police custody."  4 Cal. 5th at 678; see also United States v. Mitchell, 652 F.3d 387, 414 (3d Cir. 2011) ("To the extent that DNA profiling assists the Government in accurate criminal investigations and prosecutions (both of which are dependent on accurately identifying the suspect), it is in the Government's interest to have this information as soon as possible."); Cal. General Election Official Voter Information Guide, Proposition 69, Ballot Pamp., Gen. elec. (Nov. 2, 2004), text of Prop. 69, § II (Findings and Declaration of Purpose), p.135, available at http://vote2004.sos.ca.gov/voterguide/english.pdf (Ballot Pamp.) and Ex. A to FAC (Proposition 69 is intended to "accurately and expeditiously" identify criminal offenders through DNA profiles "at the earliest stages of criminal proceedings for felony offenses.").

Plaintiffs argue that California's law runs afoul of a "constitutional preference for judicial involvement."  Opp'n at 11.  They note that while a police officer's assessment of probable cause can justify arresting someone for a brief period, only a judicial finding of probable cause can justify holding someone for more than 48 hours, id. (citing Gerstein v.

18

United States District Court
Northern District of California

<u>Pugh</u>, 420 U.S. 103, 113–14 (1975)), and that while law enforcement may seize an individual's cell phone incident to arrest, searching that phone requires a warrant or exigent circumstances, <u>id.</u> (citing <u>Riley</u>, 134 S. Ct. at 2486). But, as discussed above, the Court in <u>King</u> did not treat DNA analysis like holding an individual for an extended time, or searching his cell phone records; it treated both taking and analyzing DNA as "part of a routine booking procedure." 133 S. Ct. at 1980. [10]

The timing of DNA analysis in California does not render California's law unconstitutional.

### 2.    List of Crimes

The second difference between the Maryland and California laws is the list of crimes that qualify an arrestee for DNA identification. Although Plaintiffs stated at the motion hearing that they are no longer pressing this point, the Court will address it briefly in the interest of completeness.

Plaintiffs argued that "California takes DNA from persons arrested for far less serious crimes than those covered by the Maryland statute," noting that King was arrested for first- and second-degree assault after "menacing a group of people with a shotgun," <u>King</u>, 133 S. Ct. at 1965, while California law requires DNA sampling of all felonies, some of which sound quite mild in comparison, <u>see</u> Opp'n at 12–13 (noting that "taking $250 worth of nuts from an orchard" is a felony); <u>see also</u> FAC ¶¶ 13, 16, 22 (listing the felonies at issue here). Plaintiffs contend that the Supreme Court made repeated reference to crimes of violence, that the government has a greater interest in solving serious crimes, and that DNA evidence is likely to be more useful in solving serious crimes. Opp'n at 13.

This argument has no merit. The Supreme Court was clear that, although the case before it dealt with a particular Maryland law, its ruling applied to other states' arrestee DNA laws. <u>See</u> <u>King</u>, 133 S. Ct. at 1968 (citing "Brief for State of California et al."); <u>see</u>

---

[10] Plaintiffs' reliance on the "pre-<u>King</u> precedent" of <u>United States v. Pool</u>, 621 F.3d 1213, 1215, 1228 (9th Cir. 2010), <u>vacated as moot</u>, 659 F.3d 761 (2011), which treated a magistrate judge's finding of probable cause to detain a person for trial as the "watershed event" that allowed the government to seize and search DNA, is therefore misplaced. <u>See</u> Opp'n at 11.

also Brief for State of California et al. as Amici Curiae Supporting Petitioner at *2, Maryland v. King, 133 S. Ct. 1958 (2013) (No. 12-207), 2013 WL 98697 (informing Court that "the majority of state legislatures and the United States Congress have enacted statutes requiring felony arrestees to provide buccal swab samples") (emphasis added). The Court noted that, although the different states' laws varied "in their particulars, such as what charges require a DNA sample," its ruling implicated those laws as well. King, 133 S. Ct. at 1968. In fact, the Supreme Court framed the question before it as "whether the Fourth Amendment prohibits the collection and analysis of a DNA sample from persons arrested, but not yet convicted, on felony charges." Id. at 1966 (emphasis added).

Although the Court did refer to "dangerous" or "serious" crimes at various times in the King opinion, see, e.g., id. at 1978 ("Once an individual has been arrested on probable cause for a dangerous offense . . ."), its central holding that DNA identification is part of a routine booking procedure, id. at 1980, did not depend on a felony's dangerousness. See Buza, 4 Cal. 5th at 674–75 ("King did not purport to limit its holding to those felonies that happen to be classified as 'violent' or 'dangerous' as a matter of state law, nor did it purport to create a new classification of violent offenses as a matter of federal constitutional law."). There is good reason for this.

First, felonies are serious offenses. See id. at 674 ("as a matter of ordinary usage, a felony is considered a 'serious' offense"); Haskell, 745 F.3d at 1273 (Smith, J., concurring) ("A felony is, of course, a serious crime."); Black's Law Dictionary 650 (8th ed. 2004) (defining felony as "a serious crime, usually punishable by imprisonment for more than one year or by death"); Carachuri-Rosendo v. Holder, 130 S. Ct. 2577, 2585 (2010) (quoting Black's Law Dictionary definition of felony).

Second, variations in state law would make it difficult to have any universal understanding of what subset of felonies would constitute particularly "dangerous" or "serious" crimes under the Fourth Amendment. The court in Buza noted this, explaining that states are "under no obligation to classify any particular set of crimes as 'violent,' and different states often classify similar crimes differently." 4 Cal. 5th at 675 n.2.

20

1   Additionally, the Supreme Court has rejected the notion that "the laws of each State

2   [should] determine the reach of the Fourth Amendment." <u>See</u> <u>California v. Greenwood</u>,

3   486 U.S. 35, 43 (1998).

4       Third, the relevant balancing test does not change depending on the seriousness of

5   the felony. An individual's privacy interest does not vary depending on which felony

6   crime he commits. And the government's interest in identifying arrestees does not shrink

7   when the arrest is for a minor offense. Indeed, the Court explained in <u>King</u> that "[i]t is a

8   common occurrence that '[p]eople detained for minor offenses can turn out to be the most

9   devious and dangerous criminals.'" 133 S. Ct. at 1971 (citing <u>Florence</u>, 566 U.S. at 334-

10  35). Plaintiffs' argument that DNA evidence is more likely to be useful in solving serious

11  crimes, <u>see</u> Opp'n at 13, misses the point—the DNA evidence is not sought to solve the

12  crime for which the individual was arrested, <u>see</u> <u>King</u>, 133 S. Ct. at 1972 ("the 13 CODIS

13  loci are not themselves evidence of any particular crime); <u>Rise</u>, 59 F.3d at 1560 ("everyday

14  'booking' procedures routinely require even the merely accused to provide fingerprint

15  identification, regardless of whether investigation of the crime involves fingerprint

16  evidence."). The dissenting Justices in <u>King</u> also understood this. <u>See</u> <u>King</u>, 33 S. Ct. at

17  1989 (Scalia, J., dissenting) ("If one believes that DNA will 'identify' someone arrested

18  for assault, he must believe that it will 'identify' someone arrested for a traffic offense.

19  This Court does not base its judgments on senseless distinctions.").

20      That California's arrestee-DNA law applies to a broader range of crimes than the

21  Maryland law does not make it unconstitutional.

22              **3.    Expungement**

23      The final difference Plaintiffs point to is expungement; they argue that the

24  California law "lacks the automatic expungement provision of Maryland's law," that

25  "there is no indication of how long this process takes," and that it is altogether

26  "inadequate." Opp'n at 12. Plaintiffs cite no authority in support of this position. <u>Id.</u> In

27  fact, Plaintiffs cite no authority holding that California is required to expunge non-

28  qualifying DNA records and samples at all. <u>See generally</u> Opp'n. As Defendants point

out, courts have not held that a state must always return fingerprints or other identifying information taken at arrest. Mot. at 19–20 (citing United States v. Schnitzer, 567 F.2d 536, 539–40 (2d Cir. 1977) (arrest records, fingerprints, photographs); Loder v. Municipal Court, 17 Cal.3d 859, 863–65, 877 (1976) (arrest records); United States v. Kriesel, 720 F.3d 1137, 1139-40 (9th Cir. 2013) at 1139–40 (retention of DNA sample as apart from DNA profile)). The court in Buza, 4 Cal. 5th at 680, also observed that "retention of an arrestee's fingerprints, photographs, and other identifying information in law enforcement files generally has not been thought to raise constitutional concerns, even though the arrestee may later be exonerated."[11] Given King's holding that DNA sampling serves the same function as fingerprinting and photographing, see 133 S. Ct. at 1972, 1980, it is not clear that the Supreme Court would find that expungement is required.

Nonetheless, California has an expungement process.[12] The Department of Justice has an expedited expungement procedure so that neither a court hearing nor a 180-day waiting period is required. See generally RJN (dkt. 152-1) Ex. A (Streamlined Expungement Application Form). If the expedited request is denied, an individual may still initiate a court proceeding, using a one-page judicial council form. See RJN Ex. B (Expungement Request Instructions) at 6; Judicial Council of California, Petition for Expungement of DNA Profiles and Samples (Jan. 1, 2009) available at http://www.courtinfo.ca.gov/forms/documents/cr185.pdf (last visited June 7, 2018).

---

[11] But see People v. Christiansen, 230 Cal. App. 4th 178, 181 (2014) (finding that, upon finding of factual innocence under Cal. Penal Code section 851.8, law enforcement must seal and destroy records of arrest, which includes fingerprint impressions).

[12] An individual arrested for felonies but not charged (and others not at issue here) "may make a written request to have his or her specimen and sample destroyed and searchable database profile expunged from the databank program." Cal. Penal Code § 299(b)(1). The trial court has discretion to grant or deny the request, and its decision is nonappealable. Id. at § 299(c)(1). The Department of Justice "shall destroy" a specimen and sample and expunge a record "upon receipt of a court order that verifies the applicant has made the necessary showing at a noticed hearing, and that includes" a written request for expungement, a "letter from the district attorney certifying that no accusatory pleading has been filed," proof of written notice to the prosecuting attorney and the Department of Justice that expungement has been requested," and a "court order verifying that no retrial or appeal is pending and that it has been at least 180 days since the defendant notified the prosecuting attorney and Department of Justice of the expungement request and the court has not received an objection by either." Id. at § 299(c)(2).

The Supreme Court briefly described Maryland's expungement process in <u>King</u>, 133 S. Ct. at 1967, but that process was not part of the Court's Fourth Amendment analysis. <u>See</u> <u>Haskell</u>, 745 F.3d at 1274 (Smith, J., concurring) ("the <u>King</u> Court did not view Maryland's expungement procedures as important to the constitutionality of Maryland's law."); <u>Buza</u>, 4 Cal. 5th at 680 ("Although the high court mentioned Maryland's automatic destruction provisions in passing, it attached no significance to them in its constitutional analysis."). The Maryland law's expungement process did not factor into either the Court's assessment of the government's interests or of the individual's interest. <u>See generally</u> <u>King</u>, 133 S. Ct. at 1970–80. There is no reason to believe that the California law's inclusion of a somewhat more burdensome process for accomplishing the same ends would so alter the balancing test as to change its outcome. Instead, California's expungement process is an inconsequential example of how states' laws "vary in their particulars" from the Maryland law. <u>See</u> <u>King</u>, 133 S. Ct. at 1968.

California's expungement process does not render the DNA Act unconstitutional.

IV.     **CONCLUSION**

For the foregoing reasons, the Court agrees with Judge Smith that, in light of <u>King</u>, "[t]his case is over." <u>See</u> <u>Haskell</u>, 745 F.3d at 1275 (Smith, J., concurring). Defendants' Motion is GRANTED.

        **IT IS SO ORDERED.**

        Dated:  June 22, 2018

        _____
        CHARLES R. BREYER
        United States District Judge